UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:

REID CAMERON, and                         Case No. 07-42321
MARY CAMERON,                               Chapter 7
                                                      Hon. Walter Shapero

         Debtors.
_____/

## OPINION ON TRUSTEE'S § 707(b)(3) MOTION

### I. Introduction

Before the Court is the United States Trustee's ("UST's") Motion to Dismiss Debtors' Chapter 7 Case for Abuse Under 11 U.S.C. § 707(b)(3). On February 6, 2007, the Debtors filed a joint petition under chapter 7 of the Bankruptcy Code. On April 16, 2007, the UST filed this Motion to Dismiss. The parties agree the presumption of abuse does not arise in this case. An evidentiary hearing was held at which one witness, the Debtor Mary Cameron, testified and exhibits were introduced. At the conclusion of the hearing, the Court took the matter under advisement.

The Court has now had the opportunity to review the exhibits and consider the testimony of the witness as well as the legal authority cited by the parties. This opinion constitutes the Court's findings of fact and conclusions of law concerning whether the totality of circumstances surrounding the Debtors' financial situation demonstrates that the Debtors' bankruptcy filing is an abuse of the system under § 707(b)(3).

### II. Facts

Reid Cameron is the sole wage earner of the household and has been employed with Midwest Microwave for six years. At the time the case was filed Mr. Cameron earned a monthly gross income

-1-

of $7,124.17. Schedule I shows an average net monthly income of $5,623.41. Average monthly expenses of $5,614 are listed on their amended schedule J. The Debtors list $81,168.28 in unsecured debt, consisting of 13 credit card obligations each incurred in 2006 with balances ranging from $250 to $33,000.

The evidence established that Mr. Cameron anticipated continuing his employment with Midwest Microwave and that he received a net pay increase sometime after January 21, 2007, of approximately $190 per month. (Trustee's Ex. 2, 4). Mrs. Cameron is unemployed but intends to seek outside employment in the future. She currently provides care for her elderly mother.

Two children, ages 12 and 21, reside in the home with the Debtors. In January 2007, Mrs. Cameron's mother moved into the home as well. The Debtors' original schedule J budgeted expenses for the Debtors and both of their children. After the UST began its inquiry, the Debtors filed an amended schedule J which eliminated expenses associated with the Debtors' 21-year-old daughter. Monthly expenses associated with Mrs. Cameron's mother were not included in the amended schedule J.

Rental housing expenses of $2,500 per month are reflected in amended schedule J. The original schedule J included only $1,200 in monthly housing expenses. Testimony established that $2,500 was a more accurate estimation of rental costs. Reductions were made in several categories of expenses in order that the Debtors might afford a higher rent payment. Costs associated with piano lessons and entertainment were eliminated altogether. Other expenses, such as food, clothing and medical expenses were reduced. Despite this, the Debtors' average total monthly expenses in amended schedule J remained virtually identical to that listed on the original schedule, i.e., the original

schedule J showed average monthly expenses of $5,614.66 and the amended schedule J showed $5,614, or a difference of only 66 cents.

A specific comparison of the original and amended schedules is as follows:

| Expense | Original | Amended |
|---|---|---|
| rental payments | $1,200 | $2,500 |
| electricity and heating | $300 | $245 |
| food | $700 | $300 |
| clothing | $200 | $50 |
| laundry and dry cleaning | $50 | $0 |
| medical and dental | $308 | $100 |
| transportation | $300 | $250 |
| entertainment | $175 | $0 |
| combined car payments | $855 | $807 |
| summer school tuition | $250 | $250 |

Although a line item for summer school tuition was included on the amended schedule J, testimony established that the $250 payment was a one time payment that should not have been included as an ongoing monthly expense.

The Debtors' home, valued at $406,800, is subject to two mortgages totaling approximately $534,598.61. The first mortgage, an adjustable rate mortgage, required a monthly payment of $2,600. The rate on the first mortgage adjusted in October 2006, and the monthly payment on that mortgage alone increased to $3,200. The Debtors sought refinancing in order to avoid future

-3-

adjustments, but were unsuccessful at securing a fixed rate mortgage with a monthly payment less than $3,200. Payment on a second fixed rate mortgage is $680 per month. No mortgage payment has been made since October 2006. The home is currently in foreclosure and must be vacated by October 2007.

The Debtors seek alternative living arrangements in a home with a first floor bedroom to accommodate the physical needs of Mrs. Cameron's mother, who lives with the Debtors. Their search was limited to the Saline school district where their daughter attends school. Mrs. Cameron testified that twelve properties were considered and the Debtors anticipate renting a home with a monthly payment of $2,500. The home is approximately 2,600 - 3,000 square feet, has five bedrooms and is among the least expensive homes in the area that meets the family's needs.

Mrs. Cameron testified that her mother receives $1,300 per month in social security and pension funds. Of that, $1,000 is used to pay the mother's monthly condominium outlay. As the mother is now living with the Debtors, the condominium is for sale and presumably will sell at some point in the future. Barring any unforeseen circumstances, upon its sale the Debtors' mother may be able to contribute at least a portion of her income to offset some of the Debtors' (and her) living expenses.

Of the Debtors' $81,168.28 in unsecured debt, $29,083 or 35% is attributable to comparatively recent home improvement projects, the value of which will unfortunately be lost due to the impending loss of the home. $9,539, owed to Amalgamated Bank, was used to repair a drain field, landscape and "finish off the Debtors' home." An additional $10,408 was charged at Home Depot and $9,136 charged at Lowe's for various home improvement projects. The Debtors' home was built for them in 2000.

-4-

Mr. Cameron contributes approximately $178.20 per month toward a voluntary 401K plan, and pays approximately $134 per month toward a 401K loan with an expected payoff date of August 26, 2008. In 2006, the Debtors received a $5,200 tax refund which they testified they did not spend.

In December 2006, two months prior to the bankruptcy filing, the Debtors sold or traded two 1990 model vehicles and purchased a 2004 Chevrolet Silverado for $21,997, and a 2005 Cadillac STS for $24,497. The Debtors reaffirmed both vehicle loans and owe an aggregate value of $45,452.86 on the two cars. The Debtors' current combined car payments as shown on amended schedule J equals $807 per month exclusive of insurance, approximately $48 less than what was scheduled on the original schedule J.

The Court found Mrs. Cameron to be a credible witness.

### III. UST's Position

The UST contends the totality of the Debtors' financial circumstances demonstrates the Debtors are not in need of relief under chapter 7 and with a little belt tightening could repay a meaningful portion of their debts. The UST points to: (1) the expenditure of 45-50% of the Debtors' net income toward housing costs and the fact that the Debtors have not made a mortgage payment since October 2006, leaving those unspent funds available to them; (2) the Debtors' increase in net pay of approximately $190 per month; (3) the availability of $178.20 per month when the Debtors cease making 401K contributions, and (4) the accessibility of $250 per month when the one time summer school expense is eliminated from the monthly budget. The UST argues that with these sources of funding alone the Debtors have $619.20 per month with which to make substantial payments in a chapter 13 plan. After August 26, 2008, the Debtors gain an additional $134 per month with which to fund a chapter 13 plan, arising from having completed the 401K loan repayment.

The UST cites further sources of funding as well, including approximately $417 per month over the period of one year from the Debtors' tax refund and potential financial assistance from the Debtors' mother once her condominium is sold.

## IV. Debtors' Position

Debtors rely on *In re Wright*, 364 B.R. 640 (Bankr. N.D. Ohio 2007), for the proposition that they are entitled to allocate a reasonable amount of money toward living expenses even in the face of surrendering their home. The Debtors note they have significantly reduced their housing costs from the $4,000 per month previously owed, and argue that monthly housing costs of $2,500 are reasonable in light of the Debtors' specific housing needs. The Debtors intend to cease making 401K contributions and argue that any benefit gained from the elimination of those contributions or from the Debtors' pay increase will be consumed by an anticipated tax increase due to the elimination of the Debtors' mortgage payment. Debtors argue that any monies realized from the elimination of the summer school expense should be reallocated to other areas of the Debtors' budget.

## V. Totality of the Circumstances

The Court's authority to dismiss a case for abuse is derived from 11 U.S.C. § 707(b)(1). In those cases in which the presumption of abuse does not arise or is rebutted, the Court is directed to consider whether the Debtors filed the petition in bad faith or whether, under the totality of the circumstances, granting relief would be an abuse of chapter 7. 11 U.S.C. § 707(b)(3). The UST's argument is founded on the latter of the two grounds for dismissal - the totality of the circumstances. As the movant, the UST carries the burden of establishing, by a preponderance of the evidence, the applicability of this ground for dismissal.

This Court has previously noted that the law in this circuit on this subject is set forth in the cases of *In re Krohn*, 886 F.2d 123 (6th Cir. 1989) and *Behlke v. Eisen* (*In re Behlke*), 358 F.3d 429 (6th Cir. 2004). Under those cases, either dishonesty or lack of need, or both, justify dismissal for abuse. *In re Krohn*, 886 F.2d at 126; *In re Behlke*, 358 F.3d at 433. The UST here relies on lack of need. As it does in most motions it files under § 707(b), the UST relies on the premise that the ability to repay debts out of future earnings may, in and of itself, be sufficient to warrant dismissal for abuse. *In re Krohn*, 886 F.2d at 126.

In *In re Shelby*, No. 06-48745 (Bankr. E.D. Mich. July 25, 2007), this Court addressed the meaning of *Krohn* and its application to dismissal under § 707(b)(3) for lack of need. As in the present case, the UST in *Shelby* asserted that a debtor's ability to repay debts out of future earnings may be sufficient grounds alone to warrant dismissal. *In re Shelby*, No-06-48745, at 3. This Court observed under *Krohn*, dishonesty and lack of need are essentially alternative grounds for § 707(b) dismissals and that evidence of both dishonesty *and* lack of need were specifically cited by the *Krohn* court as grounds for support of its decision to affirm the bankruptcy court's dismissal for substantial abuse. *In re Shelby*, No. 06-48745, at 4.

*Krohn* lists a number of non-exclusive factors to be considered in determining whether to dismiss, some of which primarily pertain to honesty, others to neediness and some to both. *In re Shelby*, No. 06-48745, at 4. Whether a debtor has the ability to repay debts out of future earnings bears on the question of neediness. The court may in its discretion and under the proper set of facts find that factor alone sufficient to justify dismissal. However, the decision to do so should be made only after full consideration of the facts and upon review of whether evidence of dishonesty or neediness, or both, exist. The inquiry remains one of the totality of the circumstances. The Debtors'

ability to repay debts out of future earnings, albeit important, is not necessarily determinative on the issue of neediness and must be properly evaluated within the context of the totality of the circumstances. That is the Court's view as to the meaning and applicability of the cited Sixth Circuit precedent.

Factors to consider in determining whether the Debtors are sufficiently needy include: (a) whether the Debtors have the ability to repay their debts out of future earnings; (b) whether they enjoy a stable source of future income; (c) whether the Debtors are eligible for chapter 13 relief; (d) whether there are state remedies with the potential to ease the Debtors' financial predicament; (e) whether relief may be obtained through private negotiations with creditors; and (f) whether expenses can be reduced significantly without depriving the Debtors of adequate food, clothing, shelter and other necessities. *In re Krohn,* 886 F. 2d at 126-27.

Review of the Debtors' financial situation leads to the conclusion that the Debtors have the ability to repay a meaningful portion of their unsecured debt out of future earnings. Elimination of the summer school expense alone generates an immediate $250 per month additional income. Added to the $178.20 per month generated from the elimination of 401K contributions which the Debtors claim will be terminated, and the Debtors have $428.20 per month from which to pay their creditors. After August 26, 2008, when the Debtors 401K loan is paid off, the Debtors will have yet another $134 per month with which to pay their creditors. Altogether, making these changes alone, the Debtors have $562.20 per month that could be used to fund the remaining 48 months of a 60 month plan.

These figures are significant and indeed may not represent the full measure of additional funds potentially available to the Debtors. Also relevant is the potential income generated from the

-8-

Debtors' January 2007 pay increase, the 2006 tax refund, or any future financial assistance the Debtors' mother may provide after the sale of her condominium. While Debtors' counsel argues that increased taxes will swallow up any income generated from the termination of the 401K plan contributions and pay increase, tax rates have yet to reach 100% and such at any rate is but one part of the mix.

Looking to other factors to be considered, (1) it appears Debtors enjoy a stable source of income in that Mr. Cameron has been employed with the same company for six years and there is no evidence to suggest that his job is unstable; (2) Debtors are eligible for chapter 13 relief; (3) the Court's attention has not been directed to any appropriate state remedies; (4) the Debtors' petition was not filed because of sudden illness, calamity, disability or other event beyond their control, and (5) no evidence was provided regarding the fact or feasibility of any relief obtainable through private negotiations with Debtors' creditors.

Whether the Debtors' expenses can be significantly and further reduced without depriving the Debtors of adequate food, clothing, shelter or other necessities is a more difficult question. The UST asserts that the Debtors live beyond their means. Having reviewed the schedules as amended, the Court concludes the Debtors show a willingness to belt tighten. The expenses in amended schedule J are less than those of the original schedule and are not facially extravagant. To the contrary, the Debtors budgeted no entertainment expense, no laundry or dry cleaning expense, and a conservative food and clothing allowance. To some extent any limited additional funding might appropriately be used to supplement those areas of the Debtors' budget which are perhaps unrealistically low.

On the other hand, perhaps unwisely, at least in retrospect, the Debtors incurred more than $29,000 in credit card debt related to home improvement projects since 2006, indicating either that

Debtors were perhaps living beyond their means or a need to deal with problems arising from initial construction. Further, the Debtors have not made a mortgage payment since October 2006 which to date would have totaled some $20,000, an amount which was apparently used for living expenses.

The fact that the Debtors voluntarily reaffirmed debt on two vehicles of some $45,000 just before filing facially weighs against the Debtors. Closer examination indicates, however, there is a need for two vehicles and while these vehicles are more than basic transportation, the Debtors' combined monthly vehicle expense at $807, which does not include insurance, is only slightly higher than the allowed standard under the means test. Combined vehicle ownership costs for two cars under the means test is $803 per month, exclusive of operating costs.[1]

Likewise, while the Debtors' housing costs are unusually high, comprising 45% of their net income, factors exist which weigh both for and against Debtors in regard to their reasonableness. The Court does not dispute that the Debtors may allocate a reasonable amount of money toward living expenses, including housing, even in the face of surrendering their home. *In re Wright,* 364 B.R. at 643. Whether the amount so allocated by the Debtors is reasonable is the question. The Debtors' $2,500 per month housing costs materially exceeds the amount deemed to be appropriate by Congress. For a family of three or more living in Washtenaw County, Michigan, the mortgage/rent component of the Local Housing and Utility Standards is $1,148; for a family of four or more in that same county the mortgage/rent component is $1,320.[2]

Inquiry into whether housing costs are or are not reasonable underscores the significance of the totality of circumstances review. Housing expenses proportionally similar to those in this case

---

[1] www.usdoj.gov/ust/eo/bapcpa/20070201/meanstesting.htm.

[2] www.usdoj.gov/ust/eo/bapcpa/20070201/meanstesting.htm.

-10-

have been found to be unreasonable and excessive. *See, e.g., In re Schmonsees,* 2001 WL 1699664, at * 4-5 (Bankr. M.D. N.C. 2001) ($2,450 per month housing payment was excessive for debtor and his non-filing wife where scheduled net monthly income was $5,400). Under a different set of facts similar payments have been found to be reasonable. *See, e.g., In re Vansickel*, 309 B.R. 189, 199-200 (Bankr. E.D. Va. 2004) ($2,300 per month in rent was not excessive for a family of four in a three bedroom townhouse when the debtor's net income was $5,287 per month). In this case, the discussion of housing and vehicle costs evidences Debtors' desire to essentially maintain (to an extent that does not reflect some of the economies they recognize they need to undertake), their existing standard of living, i.e.: a similar size home, in a similar location, with similar vehicles, etc. These are the most costly of their living expenses and thus fertile ground for the UST's arguments. Debtors understandable desire to do so, however, does clash with the "belt tightening" concept that is necessarily part of the totality of circumstances abuse inquiry. However, the UST presented no sufficiently credible affirmative market evidence as to alternate housing availability, as to enable it to conclude, for instance, at what cost, and to what area Debtors might move, as a basis for weighing this factor heavily against Debtors. As other factors exist which guide the Court to resolution of this case, irrespective of how one views and weighs the Debtors' housing costs, the Court need not opine further on them.

By virtue of the foregoing there exist some factors, in addition to pure ability to pay something meaningful to creditors, which point to abuse. In light of this Court's analysis in *In re Shelby* and the totality of the circumstances, dismissal of the Debtors' chapter 7 petition is warranted. The Court will, however, provide the Debtors an opportunity to determine if they will convert this case to a chapter 13 proceeding. The UST's motion under § 707(b)(3) is granted unless, within 20

-11-

07-42321-wsd    Doc 39    Filed 09/14/07    Entered 09/14/07 16:31:37    Page 11 of 12

days from the entry of the order effectuating the opinion, the Debtors convert this case to a chapter 13 proceeding. The UST shall present an appropriate order.

**Signed on September 14, 2007**

                **/s/ Walter Shapero**
             **Walter Shapero**
             **United States Bankruptcy Judge**